## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

KIMBERLY S. HEFLIN,                    )
     Plaintiff,                      )
                               )
     v.                              )     CAUSE NO.: 2:05-CV-76-PRC
                               )
JO ANNE B. BARNHART,                   )
Commissioner of the Social Security    )
Administration,                        )
     Defendant.                      )

### OPINION AND ORDER

This matter is before the Court on a Complaint [DE 4], filed by the Plaintiff, Kimberly

Heflin, on March 7, 2005, and on an Opening Brief of Plaintiff in Support of Her Complaint [DE

14], filed by the Plaintiff on June 13, 2005.  Ms. Heflin seeks judicial review of a final decision of

the Defendant, the Commissioner of the Social Security Administration ("Commissioner"), in which

Ms. Heflin was denied Disability Insurance Benefits under Title II of the Social Security Act.  For

the following reasons, the Court grants Ms. Heflin's request to reverse and remand the decision of

the Commissioner.

### PROCEDURAL BACKGROUND

On December 28, 2001, Ms. Heflin filed an application for Disability Insurance Benefits

alleging disability as of March 1, 2001.  The application was denied initially and again upon

reconsideration.  Ms. Heflin then filed a timely request for a hearing before an Administrative Law

Judge ("ALJ"), and the hearing before ALJ William J. Wilkin was conducted on July 31, 2003.  On

October 29, 2003, the ALJ issued an unfavorable decision, finding that Ms. Heflin was not disabled

because she retained the residual functional capacity ("RFC") to perform substantially all of the full

range of sedentary work and remained capable of performing a significant number of jobs in the economy. The ALJ considered Ms. Heflin's age, education, past work experience, RFC, and the testimony of the Vocational Expert ("VE"), in making the following findings:

(1)     The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

(2)     The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

(3)     The claimant's Stroke is a severe impairment, based upon the requirements in the Regulations (20 CFR § 404.1521).

(4)     This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)     The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

(6)     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairment (20 CFR § 404.1527).

(7)     The claimant is a "younger individual between the ages of 18 and 44" (20 CFR § 404.1563).

(8)     The claimant has a "high school and higher education" (20 CFR § 404.1564).

(9)     The claimant has the residual functional capacity to perform substantially all of the full range of sedentary work (20 CFR § 404.1567).

(10)    Based on an exertional capacity for sedentary work, and the claimant's age, education, and work experience, Medical-Vocational Rule 201.21, Appendix 2, Subpart P, and Regulations No. 4 would direct a conclusion of "not disabled."

(11)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 404.1520(f)).

R. at 19-20.

Ms. Heflin filed a Request for Review with the Appeals Council, which denied reversal or remand on January 7, 2005.  Therefore, the ALJ's decision of October 29, 2003, is the final decision of the Commissioner.

Ms. Heflin timely filed her Complaint with this Court, seeking review of the final decision pursuant to 42 U.S.C. § 405(g).  On June 13, 2005, Ms. Heflin filed an Opening Brief of Plaintiff in Support of Her Complaint.  On September 30, 2005, the Commissioner filed a Memorandum in Support of the Commissioner's Decision.  On October 19, 2005, Ms. Heflin filed a Reply to Defendant's Memorandum in Support of the Commissioner's Decision.

Both parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case.  Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

**FACTS**

**A.  Background Information**

Ms. Heflin was 39 years old at the time of the ALJ's decision, which is defined as a younger person under the Social Security Regulations.  *See* 20 C.F.R. § 404.1563(c).  Ms. Heflin completed high school and earned a two year associates degree in business administration and accounting.  Her past relevant work included employment as a software technical support person, clerk, and bank teller, which are all considered semi-skilled positions.  Ms. Heflin  remained insured for Disability Insurance Benefits through the date of the ALJ's decision.

3

## B.  Medical Evidence

While at work in the evening of February 28, 2001, Ms. Heflin fell ill and was unable to drive home.  She stayed overnight at a friend's house and on March 1, 2001, she sought medical treatment at the Hammond Clinic; however, the clinic found nothing wrong.  On March 3, 2001, Ms. Heflin was hospitalized for complaints of right-side numbness and weakness that she had felt since February 28, 2001.  A brain magnetic resonance imaging ("MRI") scan showed a left hemispheric infarct, but a head computed tomography ("CT") scan was negative.  A cardiology consultation and transesophageal echocardiogram were also both negative.  Ms. Heflin's blood work was unremarkable except for a positive anti-nuclear antibody ("ANA") and slightly high triglycerides. On March 9, 2001, Ms. Heflin was transferred to the rehabilitation unit in stable condition.

Ms. Heflin was admitted to the rehabilitation unit under the care of C.J. Yoon, M.D.  Her admitting diagnosis included right hemiplegia (paralysis) due to cerebrovascular accident ("CVA"), expressive receptive aphasia (decreased ability to use or comprehend words), and left parietal (upper posterior part of the head) infarction.  At that time, these conditions caused acute paralysis to the right side of her body, gait disturbance (balance), and expressive receptive aphasia.

Ms. Heflin gradually stabilized during her hospitalization.  Near discharge, she was ambulating with a wide-based quad cane, an ankle foot arthrosis, and was independent in using a wheelchair.  She was also independent in oral motor exercises, but had a mild expressive deficit. On March 11, 2001, L. Brazely, M.D., saw Ms. Heflin in consultation for possible rheumatologic problems. Dr. Brazely's impression was a stroke syndrome of unknown etiology.  Dr. Brazely stated that he would follow Ms. Heflin's ANA level.  Ms. Heflin was discharged on March 30, 2001, with instructions to continue outpatient physical, occupational, and speech therapies.

4

After her hospitalization, Ms. Heflin saw George Abu-Aita, M.D., a neurologist, for follow up care.  April 2001, Dr. Abu-Aita's assessment was left CVA with right hemiparesis (weakness or partial paralysis), much improved, and possible mild expressive aphasia.  Dr. Abu-Aita noted that Ms. Heflin was "doing fine now."  R. at 216.  He initially prescribed Coumadin, but then switched to Plavix and baby aspirin.  He also recommended that Ms. Heflin continue physical therapy.   Dr. Abu-Aita's progress notes through November 2001 show that Ms. Heflin continued to improve neurologically.

Ms. Heflin saw Dr. Yoon three times from April to July 2001.  During this time, Ms. Heflin completed her physical, occupational, and speech therapies.  Dr. Yoon noted that Ms. Heflin's speech was intact and her right mild facial weakness had improved.  She had normal ranges of motion of her extremities.  By the end of July 2001, Ms. Heflin had a normal gait, normal strength in her extremities, and only slightly impaired balance and coordination on the right.

In August 2001, Ms. Heflin complained to Dr. Abu-Aita of increased headaches.  As a result, Dr. Abu-Aita ordered a brain MRI scan.  The MRI scan, taken on August 14, 2001, showed no changes.  Also on August 14, 2001, Ms. Heflin's blood work showed that she had a positive ANA.  Dr. Abu-Aita referred Ms. Heflin to Dr. Brazely.

Ms. Heflin saw Dr. Brazely on August 24, 2001.  Dr. Brazely noted that Ms. Heflin had regained 80-90% of the function of her right side since her discharge in March 2001.  Ms. Heflin also reported no major difficulties in her activities of daily living.  On examination, Ms. Heflin had slightly decreased motor strength in her right leg, but her gait was normal and she had full ranges of motion in her extremities.  Because he did not know the cause of Ms. Heflin's positive ANA, Dr. Brazely ordered additional blood work.  When Ms. Heflin returned on October 12, 2001, Dr. Brazely

5

noted that her blood work was negative.  He further reported that Ms. Heflin had recovered "approximately 95% of her motor and sensory strength" but that she "does have some problems with prolonged tasks such as typing and driving."  R. at 275.  He referred Ms. Heflin back to Dr. Yoon for further functional evaluation.

Ms. Heflin saw Dr. Yoon on December 10, 2001.  At that time, she complained of a new left knee pain.  Dr. Yoon noted that Ms. Heflin had "recovered very well" from her left CVA and right hemiparesis, and that her speech had "improved markedly."  R. at 259.  He added, "She is doing very well."  R. at 259.  On examination, Ms. Heflin had normal ranges of motion in all extremities and was ambulatory without any assistive device.  Yoon recommended that Ms. Heflin undergo a functional capacity evaluation and an evaluation of her driving skills at the driving school.

On January 16, 2002, Dr. Abu-Aita completed a state agency questionnaire.  He listed Ms. Heflin's diagnoses as CVA, right hemiparesis, expressive aphasia, and clumsy right hand.  Dr. Abu-Aita reported that Ms. Heflin had 4+/5 muscle strength, 2+/5 deep tendon reflexes in her right upper and lower extremities, and 4+/5 grip strength in her right upper extremity.  He stated that Ms. Heflin's ability to perform fine and gross motor movements was "not good," her ability to perform rapid alternating movements was "sluggish," and her ability to ambulate unassisted was "fair."  R. at 211.

On March 12, 2002, Kalyani Gopal, Ph.D., and Alan DeWolfe, Ph.D., performed a consultative psychological evaluation of Ms. Heflin at the request of the state agency.  Ms. Heflin reported that she could take care of her personal needs and that her daily activities included cooking, cleaning, doing laundry, and shopping on a regular basis.  Her hobbies included reading and watching television.  On memory testing, Ms. Heflin scored in the average range.  The examiners

6

noted that Ms. Heflin had no memory problems and her cognitive functions were intact. Additionally, her "speech was clear, relevant, and goal-oriented," she had "no negative effects" to her medication, and she had "no unusual, inappropriate, or delusional thought." R. at 295. It was noted that Ms. Heflin "at times, gets anxious and worries about her health and future" and her "diagnostic impression" in Axis I is "Adjustment Disorder With Anxiety." R. at 295-96.

On April 2 and 3, 2002, Ms. Heflin underwent an upper extremity functional capacity evaluation. As reported, Ms. Heflin did not express nor were there indications of significant pain or discomfort. The doctor noted that Ms. Heflin needed only minimal cues to perform good body mechanics during lifting. The quality of her movement was reported as "smooth even when right arm/leg were fatigued." R. at 310. Her significant abilities included: "1.) Sitting 2.) Non repetitive lifting of floor to waist, overhead and horizontal 3.) Left hand carry, front carry 4.) Stairs 5.) Standing 6.) Walking tolerance." R. at 310. However, her significant deficits included: "1.) Right hand coordination, strength 2.) Repetitive lifting and carrying at all levels 3.) Elevated work (right arm fatigue)." R. at 310. Ms. Heflin had decreased right arm coordination with rapid alternating movement testing, and slightly decreased right leg coordination. Ranges of motion in her upper and lower extremities, including her knees, were within normal limits. Ms. Heflin had general weakness in her right arm and leg. Her gross hand motion was within normal limits. Based on the testing, the examiner recommended that Ms. Heflin could perform exertionally light work. The examiner added:

> Client has good abilities to compensate for weakness in right arm but may be limited in tasks that require fine motor coordination such as fast, efficient typing or handwriting. These skills may improve with more practice. She has good strength of arms and legs but is limited slightly by fatigue and reports of left knee pain and would do well in a mostly sedentary or light job that does not require constant walking. She was also limited by lightheadedness which should be evaluated further

before safe return to work.  She may benefit from a return to work program (work hardening).

R. at 310-11.  Based on the results of this evaluation, Dr. Yoon stated that Ms. Heflin should not return to her old job because of her difficulties with typing fast and handwriting, but that she would be able to perform a "light-duty job."  R. at 306.

From June to September 2002, Dr. Yoon treated Ms. Heflin for her left knee only.  He noted that Ms. Heflin had recovered well from her CVA with right hemiparesis.  A left knee MRI scan taken on August 21, 2002, showed a complete tear of the posterior horn of the medial meniscus extending into the body.  Dr. Yoon also diagnosed osteoarthritis of the left knee.  In September 2002, Ms. Heflin reported that she had started using a knee brace, which was helpful.  Dr. Yoon prescribed Ultracet and Vioxx and recommended physical therapy.

On September 27, 2002, Ms. Heflin saw H. Carl Moultrie, II, M.D., in consultation for her left knee pain.  On examination, Ms. Heflin had full ranges of motion in her upper extremities, and minimal weakness in her right hand.  She had a decreased range of left knee motion (110 out of 135 degrees) and medial joint line tenderness.  Dr. Moultrie's diagnoses included a medial meniscal tear and easy bruising secondary to anticoagulation therapy.  He indicated that Ms. Heflin was a candidate for arthroscopy.

On March 6, 2003, Dr. Yoon completed a stroke residual functional capacity questionnaire for the state agency.  He stated that Ms. Heflin's prognosis was "fair" and that her symptoms included balance problems, poor coordination, vertigo/dizziness, headaches, loss of manual dexterity, weakness, slight paralysis, unstable walking, numbness/tingling, sensory disturbance, pain, fatigue, difficulty solving problems, problems with judgment, and speech/communication difficulties.  R. at 377-78.  He also stated that Ms. Heflin had difficulty using her right hand.  Dr.

Yoon opined that Ms. Heflin could stand or walk less than 2 hours and sit about 2 hours in an 8-hour workday and needed to be able to change positions at will. She could lift or carry less than 10 pounds frequently and 10 pounds occasionally, and had significant limitations in repetitively reaching, handling, or fingering. He listed her additional work-related limitations as "headaches, dizziness, lightheaded, [and] neck pain." R. at 381. Finally, Dr. Yoon opined that Ms. Heflin's pain, fatigue, and other symptoms will "often" interfere with her attention and concentration and that she will need to take unscheduled breaks during an 8-hour working day. R. at 379.

### C.  Testimony of the Plaintiff

At the hearing held on July 31, 2003, Ms. Heflin testified that she was born in 1963 and has an associates degree in Business Administration. Living in her home are Ms. Heflin and her fourteen year old daughter. Ms. Heflin previously worked in technical support, specifically dealing with payroll systems, held a clerical position in the United Postal Service, and was a bank teller.

Ms. Heflin stated that one evening, as she was about to leave work, she felt dizzy and could not drive; she felt tingling in her hand. She first went to the Hammond Clinic, where doctors found nothing wrong, and then went to Methodist Hospital in Gary, Indiana. Ms. Heflin stated that when she arrived at Methodist Hospital, she could not walk, her right hand was tingling, and she had slurred speech. She was informed that she had suffered a stroke, and that it had to take its course.

Ms. Heflin stated that she is currently not 100%. She testified that she can make a fist but that she cannot hold onto things, like a gallon of milk, in her right hand; her left hand has no problems. She further stated that she walks with a limp because of problems with her right leg. She

lost the feeling in three of her toes on her right foot, which makes driving difficult. She cannot run or stand for long, and walking three blocks now tires her.

Ms. Heflin takes medication, including Plavix, baby aspirin, and a mild depressant. The main side effect of Plavix is extra bleeding with her monthly cycle and excessive sleepiness is the main side effect of the anti-depressant.

Ms. Heflin feels dizzy after bending and loses her balance when attempting to stand after sitting for 30 minutes straight. During the day, she typically watches television, cleans, cooks, and reads. Her daughter helps her with some of the housekeeping and must carry the laundry up the stairs. Ms. Heflin goes grocery shopping with her friend and her friends do her yard work. The farthest she has walked in the past month is around an entire block, while stopping once for 5-10 minutes. She drives by herself for an hour at a time. She can stand 20 minutes before needing to sit down and can sit 30 minutes before needing to stand; she can bend and stoop "in [her] own way." R. at 54, 55. Her feet and ankles swell after sitting for 30 minutes straight; but at the hearing, after sitting for over an hour, she said she was "a little bit" uncomfortable. R. at 78-79. About three days per week she wakes up and her right side feels numb. Before her stroke, Ms. Heflin could get ready in the morning in 30 minutes but now it takes her 2 ½ hours. Finally, Ms. Heflin admits to smoking about one pack of cigarettes per every three days. She has never had problems with alcohol or drugs.

Ms. Heflin has trouble holding items with her right hand. She could lift 20 pounds with both hands, a gallon of milk with her left hand only, but could not handle a gallon of milk with her right hand only. Later, upon cross examination, Ms. Heflin stated that she could really only lift 10 pounds, not 20 pounds. With her right hand, Ms. Heflin can open door knobs but cannot carry a cup

10

of coffee because her hand shakes too much.  Ms. Heflin cannot curl her hair herself because if she tries to use her right hand, she has problems holding it above her head; she cannot use her left hand to curl her hair because she is too uncoordinated with that hand.  She can extend her arms parallel to the table in a seated position without complaint.  Heflin has a "clumsy hand" which has not yet been resolved.

With regard to her memory capacity, Ms. Heflin stated that she no longer can remember doctors' appointments or telephone numbers.  She also cannot remember certain conversations she has with friends or with her daughter.  Though she used to do it constantly, Ms. Heflin cannot remember how to use certain programs on the computer, like PowerPoint, but she still knows how to check her email.  Ms. Heflin had a memory test performed, and even though she claims to have taken the same test three or four times, she was considered in the average qualitative range.

Ms. Heflin has not seen a psychotherapist but has been taking antidepressants.  After her stroke, Ms. Heflin feels she is less of a "people person" and that her relationship with her daughter is a bit more strained.  R. at 89-90.  Also, she finds herself less able to deal with her dominant grandmother and mother, and to avoid the situation, she moved out of their home.  She has been told by her aunt that she has less patience.  Ms. Heflin gets headaches daily that she endures for about an hour, until her Aleve helps her overcome them.  Ms. Heflin had several brain MRI's and they showed nothing.  She receives long term disability from her previous employer, which will terminate next year.

### D.  Testimony of Vocational Expert

Michelle Peters testified at the hearing as a vocational expert ("VE").  The ALJ posed to the VE hypothetical #1 consisting of an individual with Ms. Heflin's age, education, and prior relevant work experience, with an RFC for light work with no repetitive stooping, bending, crawling, climbing, or walking, only low degrees of concentration, change of position at will, and no lifting above shoulder level.  The VE testified that such an individual could not perform Ms. Heflin's past work and that she has no transferrable skills to any light work that would accommodate these characteristics.  The VE stated that a person qualifying under hypothetical #1 could perform unskilled light jobs, including 5,000 existing hand-packaging positions and 4,000 existing assembly positions.

The ALJ then posed hypothetical #2, in which the person has an RFC for sedentary work with the same restrictions as listed above.  The VE testified that no past relevant work could be performed at that level with those restrictions.  The ALJ then changed the hypothetical slightly by asking if there was any unskilled sedentary work that could be performed, to which the VE replied that 2,000 assembly positions and 950 hand packaging positions exist.

Next, the ALJ proposed hypothetical #3, in which the person has an RFC for light or sedentary work, but where the worker could not sustain 8 hours of employment.  The VE stated that with such a limitation,   full-time work would be precluded; no further questions were asked regarding this hypothetical.

Finally, Ms. Heflin's attorney asked the VE about hypothetical #1 and the effect of unscheduled breaks, understood to mean breaks in addition to the morning and afternoon breaks and lunch.   The VE testified that if a worker required one additional break per day, then the existing

jobs would diminish by about 30%, but that it would not eliminate all of these positions.  However, if the worker required two additional unscheduled breaks per day, then the total number of existing jobs would be diminished by 60-75%.

### E.  The ALJ's Decision

The ALJ followed the five-step sequential analysis and first determined that Ms. Heflin had not engaged in substantial gainful activity.  The ALJ also found at step two that Ms. Heflin had a severe impairment.  The ALJ then determined that Ms. Heflin's condition does not satisfy the third step.  In the RFC, the ALJ concluded that Ms. Heflin has the following work-related limitations: lifting no more than 10 pounds and avoiding highly stressful situations.  At step four the ALJ concluded that, based on the vocational expert testimony, Ms. Heflin was not able to return to her past relevant work. In the final step of the sequential evaluation, the burden shifts to the Commissioner to show that jobs exist in significant numbers in the economy which the claimant can perform consistent with her age, education, work experience, and functional limitations.  Again, based on the testimony of the VE, the ALJ concluded that Ms. Heflin is not disabled because a significant number of jobs exist in the economy that she can perform, namely 2,000 assembly jobs and 950 hand packer jobs.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, a court reviewing the findings of an ALJ will only

reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.  *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999).  Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard.  *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000).  If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that she suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).

To be found disabled, the claimant's impairment must not only prevent her from doing her previous work, but considering her age, education, and work experience, it must also prevent her from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1520(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. § 404.1520(a)(4). The Seventh Circuit has summarized the sequence as follows:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform her past relevant work; and (5) whether the claimant is capable of performing work in the national economy. Under the five-part sequential evaluation process, "[a]n affirmative answer leads either to the next step, or, on Step 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.

*Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001) (citations omitted) (alterations in original); *see also* 20 C.F.R. § 404.1520(a)(4)(i)-(iv); *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004). At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC. "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). The ALJ must assess the RFC based on all the relevant evidence of record. *Id*. at 1001 (citing 20 C.F.R. § 404.1545(a)(1)). The claimant bears the burden of proving steps one through four, *see Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995), whereas the burden at step five is on the ALJ, *see Zurawski*, 245 F.3d at 886.

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the

important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski*, 245 F.3d at 888. The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Young*, 362 F.3d at 995 (quoting *Scott*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

In her opening brief, Ms. Heflin argues that the ALJ committed legal error concerning the credibility and RFC findings used in both steps four and five. Specifically, she argues that the ALJ improperly evaluated her subjective complaints, failed to properly determine her credibility, neglected to properly articulate his findings, erred in his RFC and credibility reasoning, and posed an incomplete hypothetical. In response, the Commissioner argues that substantial evidence supports the ALJ's RFC and credibility findings and therefore, the hypothetical posed to the VE was complete. The Court will discuss each of the five concerns raised, but within the following four sections: Credibility Determination / Evaluation of Subjective Complaints; Sufficiency of Reasoning for Findings / Articulation of Findings; RFC Finding; and Hypotheticals.

16

### A. Credibility Determination /Evaluation of Subjective Complaints

Ms. Heflin first argues that the ALJ's evaluation of her subjective complaints and credibility determination were flawed.  With regard to her credibility determination, Ms. Heflin states that the ALJ impermissibly based his disbelief of her subjective statements solely on objective medical evidence, as evidenced by his stating that "weak" medical evidence existed.  Additionally, she argues that the ALJ imposed a higher standard in evaluating her credibility than what is required by law when he required that her daily activities be objectively verified with a reasonable degree of certainty.

In response, the Commissioner asserts that the ALJ's credibility determination should be afforded great deference.  The Commissioner claims that the ALJ looked to the entire record when making his determination and that the ALJ is permitted to use the objective medical evidence in his credibility, as it is a "useful indicator."  The Commissioner notes that the ALJ pointed out the fact that many doctors stated on different occasions that Ms. Heflin was recovering well and that she had regained 80-90% of her functional capacity.  The Commissioner also notes that the ALJ looked to Ms. Heflin's daily activities, and found that some of her statements were contradicted in the record, such as when Ms. Heflin explained that she could not take care of her personal needs but yet Dr. Brazely stated that "she had no major difficulties in her activities of daily living."  Def. Br., p. 11. With regard to the alleged higher standard imposed, the Commissioner responds that because the ALJ based his finding of credibility on many different factors, including the objective medical evidence, Ms. Heflin's testimony, and her daily activities, the fact that the ALJ also considered the objective verifiability of Ms. Heflin's daily activities is not cause for remand.  Finally, with regard

to Ms. Heflin's claim that the ALJ impermissibly based his disbelief of her subjective statements on objective medical evidence, stating that it was "relatively weak," the Commissioner claims that the ALJ based his determination on many other factors, not solely on the objective medical evidence. The Commissioner further states that the ALJ had reason to say the medical evidence was "relatively weak" because he identified multiple contradictions.

Social Security regulations provide that, in making a disability determination, the Commissioner will consider a claimant's statements about his or her symptoms, including pain, and how they affect the claimant's daily life and ability to work. 20 C.F.R. § 404.1529(a). However, subjective allegations of disabling symptoms alone cannot support a finding of disability. 20 C.F.R. § 404.1529(a). The Social Security regulations establish a two-part test for determining whether complaints of pain contribute to a finding of disability: (1) the claimant must provide objective medical evidence of a medically determinable impairment or combination of impairments that reasonably could be expected to produce the symptoms alleged; and (2) once an ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of these symptoms. 20 C.F.R. § 404.1529(a), (c); *see Pope v. Shalala*, 998 F.2d 473, 482 (7th Cir. 1993).

The ALJ must weigh the claimant's subjective complaints and the relevant objective medical evidence, as well as any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

18

20 C.F.R. § 404.1529(c)(3).  In making the credibility determination, Social Security Ruling 96-7p

dictates that the ALJ "must consider the entire case record, including the objective medical evidence,

the individual's own statements about symptoms, statements and other information provided by

treating or examining physicians or psychologists and other persons about the symptoms and how

they affect the individual, and any other relevant evidence in the case record."  SSR 96-7p at *1.

The Ruling provides that the "determination or decision must contain specific reasons for the finding

on credibility, supported by the evidence in the case record, and must be sufficiently specific to

make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the

individual's statements and the reasons for that weight."  SSR 96-7p; *see Steele v. Barnhart*, 290

F.3d 396, 942 (7th Cir. 2002); *Zurawski*, 245 F.3d at 887.

 Moreover, an ALJ is not required to give full credit to every statement of pain or to find a

disability every time a claimant states that he or she is unable to work.  *Rucker v. Chater*, 92 F.3d

492, 496 (7th Cir. 1996).  However, Ruling 96-7p provides that a claimant's statements regarding

symptoms or the effect of symptoms on her ability to work "may not be disregarded solely because

they are not substantiated by objective evidence."'  SSR 96-7p at *6.

 "[T]he adjudicator may also consider his or her own recorded observations of the individual

as part of the overall evaluation of the credibility of the individual's statements."  SSR 96-7p.  As

the Seventh Circuit has stated, "because hearing officers are in the best position to see and hear the

witnesses and assess their forthrightness, we afford their credibility determinations special

deference."  *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (internal quotations and citations

omitted).  Generally, an ALJ's credibility determination will not be overturned unless it was

"patently wrong."  *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

In the instant matter, the ALJ found that regarding "the medical evidence, the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations.  More specifically, the medical evidence does not support the existence of limitations greater than those determined above," which are to not lift more than 10 pounds and avoid highly stressful situations.   R. at 16.  The ALJ stated that the "claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations."  R. at 17.  In the body of his decision, the ALJ devoted several paragraphs to establishing the reasons why the medical evidence does not substantiate Ms. Heflin's claims, integrating five doctors' opinions in his discussion (those of Drs. Yoon, Brazely, Moultrie, Gopal, and Wolfe).   The ALJ cites to several inconsistencies between the medical evidence and Ms. Heflin's claims, concluding that the "claimant's reported limited daily activities are considered to be outweighed by the other factors discussed in this decision."  R. at 18.

First, the ALJ noted that Ms. Heflin still alleges that she suffers from symptoms from her stroke to the point that she cannot function well enough to work, yet, Dr. Yoon reported that:  Ms. Heflin "had recovered well, her speech had markedly improved[,] and she was doing very well overall" and that Ms. Heflin requested to begin driving again and requested a functional capacity evaluation ("FCE").  R. at 18.  Dr. Yoon also indicated that if the FCE was favorable, he would release Ms. Heflin back to work.

The ALJ also noted that although Ms. Heflin alleged that she could not work because of her memory problems, a consultative examination revealed that she possessed good immediate memory, was able to recall several digits forward and backwards, could recall words after a time lapse, could report what she had eaten for dinner the night prior, and ultimately that her working memory was

in the average range; additionally, there were no visionary or auditory impairments observed during the examination.  As evidenced above, the Court finds that the ALJ appropriately considered Ms. Heflin's allegations in light of the objective evidence of post-stroke symptoms and the findings of the various medical examiners.  Great deference is given to an ALJ's credibility finding, in part because of the ALJ's personal observations of the claimant.  *See Powers,* 207 F.3d at 435.

Additionally, Ms. Heflin alleges that the ALJ dismissed her complaints based solely on objective medical evidence, and that this rationalization is an error of law.  The Code of Federal Regulations specifically provides that objective medical evidence "is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work." 20 C.F.R. § 404.1529(c)(2) However, the regulations go on to state that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."  *Id.*  Although Ms. Heflin's argument appears facially convincing based on a literal reading of the regulation, additional research makes clear the meaning of this code section.  In *Carradine v. Barnhart*, the Seventh Circuit noted that "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, *they [certainly] need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers*."  360 F.3d 751, 764 (7th Cir. 2004) (emphasis in original) (citing Craig v. Charter, 76 F.3d 585, 595 (4th Cir. 1996)).  Thus, the Court finds that the ALJ did not err on this basis as he

21

adequately provided reasons why Ms. Heflin's claims were inconsistent with the objective medical evidence.

The more concerning part of the ALJ's decision is the standard used to evaluate Ms. Heflin's symptoms. In *Behymer v. Apfel*, the court held that "although the ALJ can choose to disbelieve the testimony for reasons set forth in the regulations . . . objective verifiability to a reasonable degree of certainty is not a requirement imposed by law." 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999)).  In *Behymer*, the ALJ stated in his decision that:

> [A]lthough the plaintiff's daily activities were fairly limited, two factors weighed against considering them as strong evidence.  *First, the daily activities could not be objectively verified with any reasonable degree of certainty*. Second, even if the daily activities were true as alleged, the degree of limitation cannot be attributed to her medical condition as opposed to other reasons due to relatively weak medical evidence and other factors.

45 F. Supp. 2d at 662 (emphasis added).  Likewise, in the instant matter, the ALJ declared that:

> Although the claimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding the claimant disabled.  *First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty.*  Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

R. at 18 (emphasis added).  The language utilized by the ALJ in *Behymer* and in the instant case are nearly identical.  In *Behymer*, the court remanded the case because it found that the ALJ imposed an extra legal requirement beyond what was necessitated in the statute, regulations, rulings, or case law, thereby committing an error of law.  *Behymer*, 45 F. Supp. 2d at 662, (citing *Schmoll v.Harris*, 636 F.2d 1146, 1150 (7th Cir. 1980) (holding that "when . . . the district court commits an error of law, reversal is, of course, warranted irrespective of the volume of evidence supporting the factual

22

finding")) . *See also Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)*, Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).  Similarly, in the instant matter, the Court finds that the ALJ's decision is based on an incorrect standard and should be remanded.  The Commissioner states that because the ALJ based his findings on other grounds, the fact that he looked to the objective verifiability is not cause for remand.  However, any error of law warrants reversal, "no matter the volume of existing evidence supporting the finding." *Behymer*, 45 F. Supp. 2d at 662.

## B.  Sufficiency of Reasoning for Findings / Articulation of Findings

Ms. Heflin argues that the ALJ's RFC assessment was not supported by the record and his findings were not adequately stated.  Ms. Heflin states that the use of the word "weak" is vague and that the ALJ did not adequately explain his reasoning for using this word.  As proof of her disability, Ms. Heflin primarily relies on the most recent report from Dr. Yoon, a questionnaire dated March 2003, that Dr. Yoon filled out at the request of the state agency.   In response, the Commissioner contends that the ALJ repeatedly pointed to contradictions in Ms. Heflin's testimony and the medical findings, rendering the medical evidence "relatively weak."  The Commissioner also points out that the March 2003 report from Dr. Yoon is inconsistent with his own previous progress reports and other doctors' opinions.

Although the ALJ "need not address every piece of evidence," the ALJ "must articulate, at some minimum level, his analysis of the record so that the reviewing court can follow his reasoning." *Johnansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002) (citing *Diaz*, 55 F.3d at 307).  However, the Seventh Circuit has held that "even a 'sketchy opinion' is sufficient if it assures [the court] that an ALJ considered the important evidence and enables [the court] to trace its reasoning."

23

*Brindisi v. Barnhart*, 315 F.3d 783, 787 (7th Cir. 2003).  In determining whether the ALJ properly assessed the Plaintiff's RFC, the Court looks to whether the ALJ's RFC assessment was supported by substantial evidence and whether the ALJ built a logical bridge from the evidence to his conclusion.  *See Young*, 362 F.3d at 995.  The ALJ must base his opinion on the testimony and medical evidence in the record and the ALJ cannot "make his own independent medical determinations about the claimant."  *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir. 1985) (citing *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982)); *see also Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).  In making the RFC assessment, the ALJ must follow the criteria set out in 20 C.F.R. § 404.1529(a)-(d) for evaluating the Plaintiff's symptoms to determine whether they could be reasonably expected to result from an impairment shown to exist and the effect they would have on the Plaintiff's ability to work.  *See* 20 C.F.R. § 404.1529(d)(4).  "Symptoms," as the term is used in § 404.1529, refer to the Plaintiff's "own description of [his] physical or mental impairments." 20 C.F.R. § 404.1528(a).

Ms. Heflin states that the ALJ failed to articulate his findings because he said that the medical evidence was "relatively weak" and also because the ALJ points to Ms. Heflin's daily activities as justification for his findings.  However, as previously noted in this Opinion, the ALJ's statement that the medical evidence was "relatively weak" is not the only finding the ALJ made with regard to Ms. Heflin's complaints.  The ALJ referenced five doctors' reports as justification for his decision.  Although there were other reports to the contrary, what is important is that the ALJ considered all of the doctors' findings and weighed them in his determination.  Ms. Heflin states in her brief that "[c]learly, the ALJ failed to provide a reason for his finding that the medical evidence is weak."  However, the ALJ did state reasons for his findings by comparing the doctors' opinions

24

with Ms. Heflin's statements.  For example, the ALJ noted the contradiction between Ms. Heflin's claims of memory loss and medical tests showing that her memory strength is average.

Also, contrary to Ms. Heflin's allegations, the ALJ is permitted to point to the claimant's daily activities as a factor in justifying his findings.  *See* 20 C.F.R. § 404.1524(c)(3).  In this matter, the ALJ not only referenced Ms. Heflin's daily activities in his decision, but considered other objective medical evidence that contradicted Ms. Heflin's claims of daily activity limitation.  This Court finds that the ALJ properly articulated his findings.

### C.  RFC Finding

Regarding the RFC finding, Ms. Heflin alleges that in evaluating her daily activities, the ALJ failed to consider the difference between doing sporadic work and working 8 hours per day.  She claims that the activities in which she engages are restricted by her physical impairments and typically do not take up a substantial part of her day.  Additionally, Ms. Heflin argues that the ALJ failed to consider the effects of her medication, specifically Plavix, which causes excessive bleeding during her monthly cycle.  The Commissioner again contends that the alleged daily activity limitations were contradicted by the objective medical evidence.  With regard to Ms. Heflin's medication, the Commissioner argues that the only references to side effects in the medical evidence were in July 2001, when Dr. Yoon noted that "medication side effect [was] denied" and in March 2002, when it was reported that Ms. Heflin had no negative side effects from her medication.  R. at 261, 295.

"RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A 'regular and continuing

basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p. The RFC finding is an administrative assessment of the extent to which an individual's medically determinable impairments, including any related symptoms or subjective complaints, such as pain, may cause physical or mental limitations affecting the individual's capacity to do work-related activities. It is the maximum remaining ability to do sustained full-time work activities on a regular and continuing basis. *See* 20 C.F.R. § 404.1545; SSR 96-8p.

In this case, the ALJ found that Ms. Heflin has the RFC to perform a full range of sedentary work, though she should not be in a job that requires her lifting more than 10 pounds or exposes her to stressful situations.

Ms. Heflin points to various evidence in the record in support of her need for sitting, standing, unscheduled breaks, and loss of manual dexterity. Ms. Heflin testified to all of these factors during the hearing, as provided above, and some of Dr. Yoon's findings substantiate her claims. Ms. Heflin also claims that her short-term memory problems prevent her from competitive work.

Having reviewed the ALJ's decision and the evidence of record, the Court finds that the ALJ's RFC determination is supported by substantial evidence. The ALJ acknowledged all of Dr. Yoon's reports, including those that substantiate Ms. Heflin's claims. Regarding her daily activities, the ALJ observed that Ms. Heflin can clean, shop, and cook. The ALJ also pointed out that different doctors reported that Ms. Heflin had improved speech, regained 80-90% of her function on the right side, experienced no major difficulties in daily activities, and that her working memory was considered in the average range. Although Ms. Heflin relies primarily on the latest report by Dr. Yoon, that report appears to contradict Dr. Yoon's numerous, previously positive reports

26

concerning Ms. Heflin's health and daily activities.  During one visit, Dr. Yoon stated that Ms. Heflin's speech was "intact" and that she had "a normal gait, normal strength in her extremities, and only slightly impaired balance and coordination on the right."  R. at 261.  At another visit, Dr. Yoon noted that Ms. Heflin had recovered very well and improved markedly.  It was only when Dr. Yoon was asked to fill out a questionnaire for the state agency that he noted such extensive symptoms and limitations.  These contradictions tend to make Dr. Yoon less believable and lend support to the ALJ's determinations.

In his decision, the ALJ also acknowledges Ms. Heflin's testimony regarding her memory loss, noting that Ms. Heflin claims she has to write everything down or she will forget appointments, telephone numbers, and conversations.  The Court notes that little documentation exists concerning Ms. Heflin's memory and concentration problems, and that Ms. Heflin's memory problems appear to be largely, if not entirely, based on self-reported statements.  The Court finds that the ALJ's RFC determination is supported by substantial evidence of record.

### D. Adequacy of Hypotheticals

Ms. Heflin argues that because the ALJ made errors in evaluation and flaws in reasoning as to the credibility and RFC determinations, the ALJ failed to include questions in the hypotheticals presented to the VE that accurately reflect all of the limitations faced by Ms. Heflin.  The Commissioner responds by stating that the RFC and credibility determinations were sound, and therefore so were the hypotheticals.

A hypothetical question presented to a vocational expert "must fully set forth the claimant's impairments to the extent they are supported by the medical evidence in the record."  *Herron v.*

27

*Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *see also Cass v. Shalala*, 8 F.3d 552, 555 (7th Cir. 1993).

In the second hypothetical, the vocational expert was asked to consider an individual of Ms. Heflin's age and experience with employment restricted to sedentary work that did not require repetitive bending, stooping, or climbing, and had a low degree of concentration. Also, the person could not be expected to perform repetitive walking or lifting above the shoulders, and needed to change positions at will. In response to the hypothetical, the vocational expert testified as to the availability of jobs meeting those restrictions. The Court finds that because the ALJ's RFC and credibility determinations were sound, based on substantial evidence, and appropriately articulated, the hypothetical questions based on these findings accurately reflected Ms. Heflin's limitations and were therefore proper.

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ imposed an extra legal requirement resulting in an error of law. Therefore, to that extent, the Court **GRANTS** the Opening Brief of Plaintiff in Support of Her Complaint [DE 14]. The decision of the ALJ is **REVERSED** and **REMANDED** for further proceedings consistent with this Order.

SO ORDERED this 31st day of March, 2006.

s/ Paul R. Cherry
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:  All counsel of record

28